**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **THE UNITED CITY OF YORKVILLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No. 11 CV 1984 |
| ) | |
| **OCEAN ATLANTIC SERVICE** ) | Judge Rebecca R. Pallmeyer |
| **CORPORATION; AMERICAN** ) | |
| **SOUTHERN INSURANCE COMPANY; and** ) | |
| **OCEAN ATLANTIC/PFG WESTBURY, LLC** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff United City of Yorkville ("Yorkville" or "the City") brought this lawsuit for payment on certain construction bonds related to public improvements to be constructed in Yorkville, a town in Kendall County, Illinois. Defendant American Southern Insurance Company ("American Southern"), acting as a surety, issued the bonds to Yorkville on behalf of Defendant Ocean Atlantic Service Corporation ("Ocean Atlantic"). Ocean Atlantic, the principal on the bonds, failed to compete the project, and subcontractors filed liens on the subject property. Yorkville then sought payment on the bonds. American Southern refused to make payment, and warned Plaintiff that the bonds at issue were performance bonds–that is, bonds meant to assure performance of the contracted construction work–rather than payment bonds, which guarantee payment of laborers and suppliers for a project. When Plaintiff brought this suit in March 2011, the Defendants denied liability.[1] American Southern again warned Plaintiff that the bonds at issue were performance bonds. More than a year later, in June 2012, Plaintiff sought leave to file an amended complaint seeking

---

[1] The court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff is a municipal corporation organized under the laws of Illinois, with its principal place of business in Yorkville, Illinois. (Pl.'s 56.1 Stmt. of Facts [96] ¶ 4.) Defendant American Southern Insurance Company is a corporation organized under the laws of Kansas and with its principal place of business in Atlanta, Georgia. (*Id.* ¶ 5.) Defendant Ocean Atlantic Service Corporation is incorporated in the State of Virginia, with its principal place of business in Alexandria, Virginia. (Pl.'s 2nd Am. Compl. [7] ¶ 2.)

payment on the bonds, and adding, in the alternative, a claim for performance. American Southern moved to dismiss that claim, Count IV of Plaintiff's Third Amended Complaint, as time-barred. (American Southern's Mot. to Dismiss Count IV (hereinafter "Def.'s Mot. to Dismiss") [63] at 4.) This court overruled American Southern's timeliness objection without prejudice to reconsideration on a showing, on summary judgment or at trial, that the Plaintiff's delay in demanding performance unduly prejudiced American Southern. (*See* Oct. 12, 2012 Order [86].) The parties have now brought cross motions for summary judgment on all of Plaintiff's claims. For the reasons set forth herein, Defendant's motion [91] is granted, and Plaintiff's motion [94] is denied.

## PROCEDURAL HISTORY

Yorkville filed its original complaint on March 21, 2011, alleging, in three counts, that Defendants failed to make promised payments on six construction bonds covering public improvements in Yorkville.[2] (*See* Pl.'s Comp. [1].) On June 29, 2012, Yorkville moved for leave to amend its complaint to add Count IV, which seeks performance of the construction covered by the bonds as an alternative claim for relief, should the court conclude that the bonds are performance bonds rather than payment bonds. The court granted Yorkville's motion [51] on July 9, 2012, without prejudice to American Southern's timeliness defense. (*See* Jul. 9, 2012 Minute Order [56].) Yorkville filed its third amended complaint on July 9, 2012. (*See* Third Am. Compl. (hereinafter "3d Am. Compl.").) The parties have since filed cross motions for summary judgment.

## FACTUAL BACKGROUND

In May of 2005, Defendant Ocean Atlantic, a real estate developer, owned approximately 300 acres of land, the Westbury Village Subdivision Property ("Westbury Village"), located partially within the Yorkville city limits. (Pl.'s 56.1 ¶ 6.) Ocean Atlantic planned to develop Westbury Village

---

[2] Count I demanded payment on bond B98815015134 for street improvements. (Ex. A to Compl. [1].) Count II demanded payment on bonds B98815015131, B90015015132, and B988151015133 for sanitary improvements. (Exs. E-G to Compl.) Count III demanded payment on bonds B98815012754 and B98815015136 for earthwork improvements. (Exs. J-K to Compl.)

as a "contiguous planned unit development with commercial and residential uses, together with open and recreational use areas." (*Id.* ¶ 7.) As a condition of the property's development, Yorkville required Ocean Atlantic to make and pay for certain public infrastructure improvements, including earthwork, sanitary sewer, water main, storm sewer, streets, erosion control, and landscaping improvements. (*Id.* ¶ 8.) Yorkville Subdivision Control Ordinance § 8.02.01 requires a developer to post an irrevocable bond payable to the City of Yorkville "to assure the satisfactory installation of required improvements." (Yorkville Subdivision Control Ordinance, Ord. No. 2004-52 § 8.02.01 [96-7], Ex. 4 to Pl.'s 56.1, at 18.) The ordinances required Ocean Atlantic, as a developer, to post bonds covering 110% of the estimated cost of the improvements. (Pl.'s 56.1 ¶ 10.) To satisfy this requirement, between October of 2005 and June of 2006, American Southern, acting as a surety for Ocean Atlantic, issued several bonds to Yorkville covering the required improvements.[3] (Pl.'s 56.1 ¶¶ 11-18.) All of the bonds are identical, except for the amount insured and the specific improvements guaranteed. Each bond represented that 110% of the cost of the relevant improvement "is available to be drawn upon for the benefit of [Yorkville] upon presentation to [American Southern] of your demand for performance." (The Bonds at 1.)

The bonds set forth a list of events or conditions that would entitle the City of Yorkville to deem Ocean Atlantic in default, triggering the right to make a demand on the bonds. One of those conditions is "if the City of Yorkville has determined that the public improvements or other improvements covered by this [bond] have been or are likely to be the subject of liens or other

---

[3] Count I demands payment on bond B98815015134 for street improvements. (Ex. A to 3d Am. Compl.) Count II demands payment on bonds B98815015131, B90015015132, and B988151015133 for sanitary improvements. (Exs. E-G to 3d Am. Compl.) Count III demands payment on bonds B98815012754 and B98815015136 for earthwork improvements. (Exs. J-K to 3d Am. Compl.) Count IV demands damages for failure to complete performance on all the six of the aforementioned bonds. All six bonds that are the subject of Plaintiff's third amended complaint are referred and cited to herein collectively as "the bonds".

3

claims by contractors, subcontractors or third parties." (3d Am. Compl. at 4, 6-7, 10, 14[4]; The Bonds at 3.) In the event of a default, the bonds provide that the City of Yorkville can make a demand on the bonds by "presenting the Surety with a letter from the City Clerk . . . demanding performance accompanied by the certificate of the City Clerk . . . certifying the basis for the default and demand on this Subdivision Bond." (Ex. A to 3d Am. Compl. at 3; Ex. E to 3d Am. Compl. at 3; Ex. F to 3d Am. Compl. at 3; Ex. G to 3d Am. Compl. at 3; Ex. J to 3d Am. Compl. at 3; Ex. K to 3d Am. Compl. at 3.)

Ocean Atlantic contracted with subcontractors to complete some of the improvements. (Pl.'s 56.1 ¶¶ 20, 22, 24.) Those subcontractors included: Aurora Blacktop, Inc. ("Aurora Blacktop") for street improvements; Pirtano Construction Company ("Pirtano") for water main and sanitary and storm sewer improvements; and Ryan Incorporated Central ("Ryan") for earthwork and erosion control improvements (collectively "the Subcontractors"). (*Id.*) The project stalled after Ocean Atlantic ran into financial difficulties, and the subdivision was never completed. The Subcontractors filed mechanics liens against the Westbury Village property for the unpaid work, the first on February 22, 2007; a second on August 22, 2007; and a third on November 27, 2007.[5] (Def.'s 56.1 Resp. ¶¶ 21, 23, 25.)

In December of 2007, Ocean Atlantic retained CEMCON, Ltd, ("CENCOM"), a licensed professional engineering firm, to determine what improvements had been completed, and the cost to complete the remaining work. (Def.'s 56.1 ¶¶ 26-27; Heath Aff. [93-13], Ex. I to Def.'s 56.1, ¶ 7.) CEMCON estimated that as of December 2, 2007, the cost to complete the improvements was at

---

[4] The court uses page numbers rather than paragraph numbers for reference because the paragraph numbers in the Third Amended Complaint and Defendant's Answer thereto are not sequential.

[5] The February 22, 2007 lien related to bond B988815015134. (Ex. A to 3d Am. Compl.) The August 22, 2007 lien related to bonds B988815015131, B988815015132, and B988815015133. (Exs. E-G to 3d Am. Compl.) The November 27, 2007 lien related to bonds B98815012754 and B988815015136. (Ex. J-K to 3d Am. Compl.)

4

least $568,023.06 and, including contingent factors, $720,577.14. (Def.'s 56.1 ¶ 28.) The record is silent as to what, if any, action was taken regarding the bonds between December 2007 and May 2009.

On May 26, 2009, the Yorkville City Council directed the City Clerk to make demand upon American Southern for payment on three of the bonds covering sanitary improvements, each of which was already subject to a lien.[6] (Pl.'s 56.1 ¶ 28-32.) Yorkville made that demand by letter on May 28, 2009, notifying American Southern that improvements covered by the bonds were subject to liens, and demanding "payment of the referenced bonds." (Pl.'s 56.1 ¶¶ 29-32; May 28, 2009 Letter from Yorkville City Clerk Jacquelyn Milschewski to American Southern, Ex. I to 3d Am. Compl., at 1.) American Southern, acting through the United Risk Management Corporation ("URMC")–a company it "engaged to assist [it] pertaining to the claims made by Yorkville"–responded in a letter on June 18, 2009 that the bonds at issue were performance bonds, not payment bonds. (Def.'s Rule 56.1 Stmt. of Facts [93] (hereinafter "Def.'s 56.1") ¶ 12; June 18, 2009 Letter from URMC to Milschewski, Ex. M to 3d Am. Compl., at 1-2.) URMC, on behalf of American Southern, wrote that because the bonds were performance bonds, not payment bonds, Yorkville had no basis to demand payment for unpaid contractors, subcontractors, or third parties: the City could only demand completion of construction work. (June 18, 2009 Letter from URMC to Milschewski at 1-2.) The letter also requested (without setting a specific deadline) that Yorkville "[p]lease advise, in writing" if Yorkville would make a demand on American Southern "to complete and guarantee the performance/completion of the bonded improvements" pursuant to the bonds. (*Id.* at 2.)

In the meantime, it had become clear that sanitary improvements were not the only aspect of the project that was incomplete. On June 17, 2009, Ocean Atlantic sent a letter to Yorkville,

---

[6] Those three bonds were B988815015131, B988815015132, and B988815015133.

stating that because the default provisions on the bonds had been met through liens and pending foreclosures[7] on the property, "it is our recommendation that the City call all of the bonds . . . to ensure that the subdivision is completed and that all existing mechanics liens are released . . . . Funds received from the bonds should be placed into an escrow to pay for the release of any mechanics liens and to ensure the completion of any improvements." (June 17, 2009 Letter from Ocean Atlantic to Yorkville [96-13], Ex. 9 to Pl.'s 56.1, at 1.) Yorkville characterizes this letter as an acknowledgment, on the part of Ocean Atlantic, the developer, that "payment on [each of the bonds] should be made." (3d Am. Compl. at 4, 8, 11.) American Southern does not offer its own spin on the letter's meaning; it argues that the letter is irrelevant since the bonds "specifically state[] that neither the obligee [Yorkville] nor the surety [American Southern] are bound by the instructions of the principal [Ocean Atlantic]." (American Southern's Answer and Affirmative Defenses to Pl.'s 3d Am. Compl. (hereinafter "Def.'s Answer") [88] at 7-8, 14, 20, 29.)

On August 28, 2009, Yorkville again made a demand for payment on American Southern, this time for payment on all of the bonds. (Pl.'s 56.1 ¶¶ 33-38.) American Southern refused to make payment, reiterating its position that the bonds were performance bonds, not payment bonds, in a letter sent from URMC to Yorkville on September 11, 2009. (Pl.'s 56.1 Resp. ¶ 13; Sept. 11, 2009 Letter from URMC to Milschewski of (hereinafter "September letter"), Ex. N to 3d Am. Compl., at 2.) In the September letter, URMC reminded Yorkville that it had responded previously to Yorkville's demand for payment by pointing out that the bonds were performance bonds, and enclosed a copy of the June 18, 2009 letter "for your easy reference." (September letter at 2.) In closing, the September letter stated that "any questions" could be addressed to URMC President Martin Hanson and that all communications were "made with the express reservation of rights and

---

[7] Details concerning foreclosures do not appear in the record.

defenses . . . [including] any defenses that may arise as a consequence of the passage of time under any applicable limitations." (*Id.* at 3.)

Yorkville brought suit against American Southern on March 21, 2011 to recover for its payment obligations on the bonds, interest, and other fees. (See Pl.'s Compl.) The record does not reflect what, if anything, happened during the eighteen months between September 2009 and March 2011. Nor has Yorkville explained its apparent inaction during this period. In its June 9, 2011 answer to Yorkville's complaint, American Southern again asserted that the bonds were performance bonds, not payment bonds. (American Southern's Answer and Affirmative Defenses to 2d Am. Compl. [11] at 16.) Yet another year passed before, on June 20, 2012, Yorkville made an alternative demand for performance on the bonds. (Pl.'s 56.1 ¶¶ 39-42.)

In June 2012, CEMCON was retained again, this time by Yorkville, to analyze the estimated cost to complete improvements. (Def.'s 56.1 ¶ 31.) In this second report, CEMCON concluded that the cost of the remaining improvements had risen to $1,818,650.16 as of June 2012. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 Resp. ¶ 32.) The report includes the following costs to complete the improvements: remaining mass earthwork items $104,630.85; remaining underground, paving and lighting work $1,314,019.31; and allowance for replacement water main $400,000.00. (2012 CEMCON Rpt. [96-14], Ex. 10 to Pl.'s 56.1, at 1.) Yorkville contests the inclusion of the water main in the total because the report states that the allowance for the water main is included as a contingency in the event that it needs to be replaced. (*Id.*) According to Yorkville, the figure should be reduced to $1,418,650.16, because there has not yet been a finding that the water main needs to be replaced. (Pl.'s 56.1 ¶ 43.)

## **DISCUSSION**

As noted, both sides have moved for summary judgment. Yorkville's position from the beginning of this case is that the bonds at issue are payment bonds. Counts I through III of Yorkville's third amended complaint allege breach of contract for American Southern's failure to pay

7

on the disputed bonds and seeks damages comprised of the lien claims asserted by the Subcontractors. (3d Am. Compl. at 1-12; Pl.'s Resp. to Def.'s 56.1 Stmt. of Add'l Facts [108] (hereinafter "Pl.'s Resp. to 56.1 Add'l") ¶ 20.) In Count IV, added in June 2012, Yorkville seeks performance of the construction covered by the bonds as an alternative claim for relief, if the court concludes that the bonds are performance bonds rather than payment bonds. (3d Am. Compl. at 12-15.) American Southern stands by the position it has taken since the outset: that Yorkville is not entitled to seek payment on the lien claims asserted by the Subcontractors because the bonds are performance bonds. Thus, Defendant urges, the only relief Yorkville is entitled is to demand performance of the construction work guaranteed by the bonds. American Southern argues further that it is now too late for Yorkville to seek performance because any claim for performance is barred by barred by 735 ILCS 5/13-214(a), the four-year statute of repose for Illinois construction projects. American Southern also claims that permitting a demand for performance now, nearly six years after the events precipitating the default on the bonds, would cause undue hardship.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In considering a summary judgment motion, the court construes the evidence and all inferences in the light most favorable to the nonmoving party. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir. 1997). Once a motion for summary judgment has been properly supported, the opposing party has the burden of setting forth specific facts which present a genuine issue of fact for trial. *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir. 1986). Because both parties have moved for summary judgment, the court adopts a "Janus-like perspective: As to each motion the nonmovant's version of any disputed facts must be credited." *Adkins v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 787 F.Supp.2d 812, 814 (N.D. Ill. 2011).

**I.    Payment Bonds v. Performance Bonds**

The first point of contention is whether the bonds at issue are performance bonds, payment bonds, or both. "There are two kinds of surety bonds, performance bonds and payment bonds." *Western Waterproofing Co., v. Springfield Hous. Auth.*, 669 F. Supp. 901, 903 (C.D. Ill. 1987) (quotation and citations omitted). Performance bonds serve to ensure the contractor's performance of its obligations under the construction contract, while payment bonds assure that the contractor pays for materials and labor. *Id.* (quotation and citations omitted); s*ee also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140 (1962). "Where a bond guarantees performance, the obligation of the contractor in legal effect becomes the obligation of the surety . . . ." *Fisher v. Fid. & Deposit Co. of Maryland*, 125 Ill. App. 3d 632, 639, 466 N.E.2d 332, 338 (5th Dist. 1984) (citation and internal quotation omitted). A performance bond is intended "to protect the named obligee against the risk of contract nonperformance, and is not intended to offer financial balm to the hurts of everyone involved with the construction project." 4 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 12:9 (Phillip J. Bruner & Patrick J. O'Connor, Jr., West 2002 & Supp. 2008). A payment bond, by contrast, exists where the surety promises to fulfill a contractor's duty to pay laborers and material suppliers. RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTEE § 69(c) (1996). A payment bond "is, by definition, for the protection of the of the subcontractors." *Western Waterproofing Co.*, 669 F. Supp. at 905.

Yorkville argues that the bonds are in fact payment bonds, highlighting language on the bonds requiring American Southern to perform and make payment at Yorkville's demand. (Pl.'s Mem. at 6.) The bonds state that "demands for *payment* in conformity with the terms of this Subdivision Bond will be duly honored . . . ." (The Bonds at 4.) (emphasis added). American Southern insists, in contrast, that the bonds at issue are performance bonds only. (Def.'s Mem. at 4-5.) In support, American Southern notes that in addition to payment, the bonds also make reference to performance. The amount of each bond "is available to be drawn upon for the benefit of said City upon presentation to this institution of you demand for *performance* . . . ." (The Bonds

at 1.) (emphasis added). Demands on the bonds are to be "made by presenting the Surety with a letter from the City Clerk of the City of Yorkville demanding *performance* . . . ." (*Id.* at 3.) (emphasis added). Moreover, when the word "payment" appears in the bonds, America Southern points out that it is always tied to, and consistent with, the obligations to guarantee the installation of any uncompleted improvements. (Def.'s Resp. at 1.)

The court concludes that the bonds are indeed performance bonds. A performance bond typically contains only the surety's promise to fulfill the contractor's duty to the obligee. RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTEE § 69(c) (1996). Here, the express language of the bonds makes clear that their only purpose is to guarantee completion of the improvements and to protect Yorkville against the risk of contract nonperformance. Each bond explicitly states: "This Subdivision Bond is issued for the purpose of guaranteeing the installation of the following public improvements in the aforesaid subdivision: . . . ." (The Bonds at 1.) The Bonds also provide: "It is recognized that the City has directed our customer to proceed with the construction of public improvements upon the guarantee of this irrevocable commitment." (*Id.* at 3.)

As noted, payment bonds benefit laborers and material suppliers. *Western Waterproofing Co.*, 669 F. Supp. at 905; RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTEE § 69(c) (1996). The bonds do not purport to guarantee the payment of subcontractors or material suppliers for work already completed. The bonds at issues contain no language, for example, to the effect that American Southern is guaranteeing payment for labor and materials. *Cf., Young v. Gen. Ins. Co. of Am.*, 33 Ill. App. 3d 119, 121, 337 N.E.2d 739, 741 (1st Dist. 1975) ("In order for a third person to recover on a performance bond which on its face is for the use of other parties, the primary object and purpose of the bond must be for the benefit of the third party and it must have been made for the direct benefit of the third party.") In fact, the bonds identify the City of Yorkville as the sole beneficiary, stating that the bonds are "available to be drawn upon for the benefit of said City." (*Id.* at 1.)

Yorkville argues, in the alternative, that whether or not the bonds are payment bonds or performance bonds is a distinction without a difference because "performance" on the bonds requires payment to Yorkville of the amounts demanded. (Pl.'s Resp. at 8.) Yorkville observes that the bonds state: "We hereby engage with you that all demands for payment in conformity with the terms of this Subdivision Bond will be duly honored on presentation to us prior to the expiration of this Subdivision Bond." (The Bonds at 3.) Yorkville is correct that both types of bonds ultimately require the surety to make payment, but the distinction between performance bonds and payment bonds remains significant because it determines what Yorkville can demand payment for. In Counts I though III, Yorkville seeks damages comprised of the lien claims asserted by the Subcontractors. (Pl.'s Resp. to 56.1 Add'l ¶ 20; *see* 3d Am. Compl. at 1-10.) Such relief is not available to Yorkville because the bonds were not issued for the protection of the subcontractors and do not call for the payment of subcontractors or material suppliers for work performed. Instead, as American Southern observes, the apparent purpose of the bonds is to pay for uncompleted work. (Def.'s Resp. at 6; Def.'s Reply. at 9.) "A surety is not bound beyond the express terms of the performance bond and, when interpreting a performance bond, the court must look solely to the unambiguous language of the bond as evidence of the intentions of the parties." *Solai & Cameron, Inc. v. Plainfield Cmty. Consol. Sch. Dist. No. 202*, 374 Ill. App. 3d 825, 836, 871 N.E.2d 944, 953 (3d Dist. 2007); (citing *Board of Local Improvements S. Palos Twp. Sanitary Dist. ex rel. N. Side Tractor Sales Co. v. St. Paul Fire & Marine Ins.*, 39 Ill. App. 3d 255, 257-58, 350 N.E.2d 36, 38-39 (1st Dist. 1976)). Any payments made by American Southern would be tied to its obligation to guarantee the installation of any uncompleted improvements after Yorkville has made a demand for performance. The court grants American Southern's motion for summary judgment on Counts I though III.

**II.     Rule 15(c) Relation Back**

In Count IV, filed in June 2012, Yorkville for the first time made a demand for performance on the bonds. As noted, American Southern moved to dismiss Count IV under Federal Rule of Civil Procedure 12(b)(6) arguing that Count IV, filed more than four years after Yorkville knew or should have known of the underlying claim, was barred by 735 ILCS 5/13-214(a), the four-year statute of repose for Illinois construction projects. (Def.'s Mot. to Dismiss at 4.) The statute provides that "contract actions against a surety on a payment or performance bond shall be commenced" within the time limit for the bond principal. 735ILCS 5/13-214(a). In an earlier order, the court determined that the four-year repose period for construction-related claims applied to Yorkville's claim. (Oct. 12, 2012 Order [86] at 7-8.) Yorkville knew of Ocean Atlantic's alleged breach no later than November 27, 2007, and thus, Yorkville had until November 27, 2011 to commence an action against American Southern for payment or performance on the bonds. (*Id.* at 8; *see* 735ILCS 5/13-214(a).) Yorkville filed its lawsuit seeking payment on the bonds on March 21, 2011, within the statutory period. (*See* Pl.'s Comp.) Yorkville concedes, however, that it did not make its first claim for performance until June 20, 2012, nearly seven months after the statutory period had expired. (Pl.'s 56.1 Resp. ¶ 17.)

Rule 15(c) provides that an amendment to a pleading dates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading." FED R. Civ. P. 15(c)(1)(B). Because Yorkville's performance claim in Count IV is based on the same conduct, transaction, or occurrence as the payment claims asserted in its original pleadings, the court found that there was a clear factual nexus between Yorkville's timely payment claims and its newly asserted performance claim. (Oct. 12, 2012 Order at 9.) The court hesitated, however, to hold, as a matter of law, that relation back was appropriate in this case because the question of whether, and to what extent, American Southern was prejudiced by the delay went beyond the pleadings. (Oct. 12, 2012 Order at 10-11.) The court overruled American Southern's timeliness objection,

without prejudice to reconsideration on a showing, on summary judgment or at trial, of prejudice arising from the delay.

American Southern now argues that Count IV cannot relate back to Yorkville's original complaint, because to do so would cause it substantial prejudice. (Def.'s Mem. at 4.) American Southern claims that by failing to make a timely demand of performance, Yorkville has increased American Southern's potential liability by over one million dollars. (Def.'s Mem. at 4.) Yorkville, however, insists that whether American Southern is prejudiced by the amendment is not dispositive. Yorkville argues that prejudice is considered only when the amendment seeks to add an additional party pursuant to Rule 15(c)(1)(C)–not when the amendment adds a new claim against an existing party–so long as the amendment complies with Rule 15(c)(1)(B). Rule 15(c)(1) provides that an amendment relates back to the date of the original pleading when:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c). It is only Rule 15(c)(1)(C)(i) that references prejudice as a factor in allowing an amendment as to the proper party or proper name of a party. Rule 15(c)(1)(B) does not explicitly include prejudice as a factor; presumably, if an amendment meets the criteria contained in Rule 15(c)(1)(B), then the affected party likely has notice of the potential claims and defenses that could be raised.

Yorkville observes that the cases in the court's order addressing prejudice concerned an

13

amendment changing the naming of the party from official capacity to individual capacity, *e.g., Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991); or individual securities purchasers to corporate purchasers, *e.g., Staren v. Am. Nat. Bank & Trust Co.*, 529 F.2d 1257, 1263 (7th Cir. 1976). Count IV merely adds an alternative theory of relief, which this court has determined arises out of the same transaction or occurrence. (Oct. 12, 2012 Order at 9.) Relation back does not offend policies underlying a limitations period if the original complaint fairly discloses the general fact situation and occurrence out of which the new claim arises. *In re Olympia Brewing Co. Securities Litigation*, 612 F.Supp. 1370, 1373-1374 (N.D. Ill. 1985). The court holds that, in this case, relation back is permissible because the original complaint fairly disclosed the exact occurrence out of which the new claim arises.

### III.  Laches

The discussion of prejudice does not end with Rule 15(c), however. American Southern has also asserted that Yorkville's performance claim is barred by laches. (Def.'s Ans. at 30.) "Laches is an equitable principle which bars recovery by a litigant whose unreasonable delay in bringing an action for relief prejudices the rights of the other party." *Ruddock v. First Nat. Bank of Lake Forest*, 201 Ill. App. 3d 907, 917, 559 N.E.2d 483, 489 (2d Dist. 1990). Laches has been defined as "such neglect or omission to assert a right as, taken in conjunction with lapse of time of more or less duration, and other circumstances causes prejudice to the adverse party." *Holt v. Duncan*, 33 Ill. App. 2d 477, 481, 180 N.E.2d 36, 38 (4th Dist. 1962) (quoting *Holland v. Richards*, 4 Ill.2d 570, 577, 123 N.E.2d 731, 735 (1955)). This defense is applicable when the plaintiff's failure to bring a timely claim is attributed to lack of due diligence. *Miller v. Bloomberg*, 126 Ill. App. 3d 332, 336-37, 466 N.E.2d 1342, 1346 (2d Dist. 1984) (citing *Pyle v. Ferrell*, 12 Ill.2d 547, 552, 147 N.E.2d 341, 344 (Ill. 1958)). Delay in asserting a right alone, however, does not constitute laches. *Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione,* 144 Ill. App. 3d 934, 941, 494 N.E.2d 795, 800 (5th Dist. 1986). American Southern must establish: (1) neglect or omission to assert a right; (2) a lapse of

14

time; and (3) circumstances which cause have caused it prejudice. *Miller*, 126 Ill. App. 3d at 336-337, 466 N.E.2d at 1346. The party asserting the affirmative defense of laches bears the burden of establishing the defense by a preponderance of the evidence. *LaSalle National Bank v. Dubin Residential Communities. Corp.*, 337 Ill. App. 3d 345, 351, 785 N.E.2d 997, 1001 (1st Dist. 2003).

American Southern claims that in the six years since Yorkville first became aware that it had a claim on the bonds, the property at issue has deteriorated and construction and commodities costs have increased. American Southern insists that Yorkville's delay in asserting its claim for performance have deprived American Southern of the opportunity to remedy the construction problems in a cost effective way.

Yorkville argues that any prejudice suffered by American Southern is its own fault (Pl.'s Resp. at 14), but the court is struck by Yorkville's own unexplained failure to take action. Yorkville knew of the alleged defaults on the bonds no later than November 27, 2007 when it learned of the last of the three liens filed by the Subcontractors. Yet, Yorkville did not make its first demand on the bonds until May 28, 2009. (Pl.'s 56.1 ¶¶ 29-32.) On June 18, 2009, American Southern, acting through URMC, warned Yorkville that the bonds at issue were performance bonds, not payment bonds. In September 2009, American Southern followed up, again advising Yorkville that the bonds were performance bonds and directing that "any questions" be addressed to URMC President Martin Hanson. The September letter made an "express reservation of rights and defenses . . . [including] any defenses that may arise as a consequence of the passage of time under any applicable limitations." (*Id.* at 3.)

Instead of making a demand for performance, at this point Yorkville again dropped the matter for another year and a half until,finally filing suit against American Southern on March 21, 2011–but asserting only payment claims Throughout this litigation, American Southern has maintained that the bonds were performance bonds requiring Yorkville to make a demand for

15

performance. (*See* American Southern's Answer and Affirmative Defenses to 2d Am. Compl. at 16; Def.'s Mot. to Dismiss.) Yorkville has not suggested that it was uncertain how to assert a performance bond claim, nor misled by the circumstances of the litigation; American Southern warned Yorkville repeatedly that the bonds in question were performance bonds, not payment bonds. Yorkville could easily have made a demand for performance prior to initiating this litigation or added a claim on the bonds as performance bonds earlier, but it chose not to.

Meanwhile, the costs of completing the improvements have increased dramatically. The evidence shows that by failing to make a timely demand for performance, Yorkville increased American Southern's potential liability by between $698,073.02 to $1,098,073.02. The December 2007 CEMCON report estimated the cost to complete the unfinished improvements at $720,577.14. (Def.'s 56.1 ¶¶ 26-28.) Yorkville disputes the accuracy of these estimates, pointing out that the Letter of Credit Reduction Request states: "Although the constructed improvements have not been measured by CEMCON, Ltd., the quantities appear reasonable based on our knowledge of construction activities." (Pl.'s Resp. to Def.'s 56.1 Stmt. of Facts [103] (hereinafter "Pl.'s 56.1 Resp.") ¶ 26.) Yorkville argues that CEMCON's 2007 estimate is unreliable because it did not measure the constructed improvements. (Pl.'s Reply to Def.'s Mot. for Summ. J. [107] at 12.) CEMCON's report states, however, that it identified that remaining work item based on data obtained during site visits between November 2006 and December 2007. (Def.'s Reply to Pl.' 56.1 Resp. [105] ¶ 31.) The 2012 CEMCON report represents that the cost of the remaining improvements has increased to $1,818,650.16. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 Resp. ¶ 32.) Yorkville also contends that this figure should be reduced to $1,418,650.16, resulting in a difference of $698,073.02 (Pl.'s 56.1 ¶ 43), but even that calculation shows that the cost of performance has increased substantially.

American Southern has shown by a preponderance of the evidence that Yorkville neglected to assert its performance claim in a timely manner. American Southern has shown, further, that the

delay caused prejudice: Defendant was denied the opportunity to remedy the construction problems in a cost effective way, and the cost of performance on the contract increased significantly. Yorkville's claim for performance asserted in Court IV is barred by the laches defense. Therefore, American Southern's motion for summary judgment is granted and Yorkville's motion is denied.

## CONCLUSION

For the reasons discussed above, the court grants Defendant's motion for summary judgment [91] and denies Yorkville's motion for summary judgment [94].

ENTER:

Dated:   September , 2013          _____
                                   REBECCA R. PALLMEYER
                                   United States District Judge